1

2        HONORABLE RONALD B. LEIGHTON

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
9                              AT TACOMA

10  PHYLLIS GORDON, as the Personal
    Representative of the estate of Anthony
11  Gordon, and MARCOS GORDON and          Case No. CV-09- 05069RBL
    PHYLLIS GORDON, husband and wife,       (CONSOLIDATED)
12

13                        Plaintiffs,
                                            ORDER ON DEFENDANTS' MOTION
14             v.                           FOR SUMMARY JUDGMENT
                                            [Dkt. # 27]
15

16  STATE OF WASHINGTON, Department of
    Social & Health Services, Western State
17  Hospital; ANDREW PHILLIPS, in his
    individual and official capacities; EDWARD
18  L. KELLY, in his individual and official
    capacities; DONNA STAGLE, in her
19  individual and official capacities; JOHN DOE
    & JANE DOES 1 through 20, in their
20  individual and official capacities,

21

22                        Defendants.

23

24

25                            INTRODUCTION

26        This MATTER comes before the Court on Defendants' Motion for Summary Judgment [Dkt. #27].

27  This case involves the suicide of Anthony Gordon in Western State Hospital on January 4, 2008.   Plaintiffs

28  are the Estate of Anthony Gordon and his parents, Marcos and Phyllis Gordon, who pursue claims on their

own behalf.  Washington State, DSHS, and WSH defendants have moved for summary judgment, asking the Court to determine as a matter of law that Plaintiffs' 42 U.S.C. § 1983 and state law claims should be dismissed against them because they are not "persons" subject to suit under 42 U.S.C. § 1983, and because they are immune under the 11th Amendment.  The individual defendants ask the Court to dismiss Plaintiffs' 42 U.S.C. § 1983 claim because there is no constitutional violation, and the remaining state claims–for spoliation, negligent and intentional infliction of emotional distress, tortious interference with a body, and negligent training or supervision–because none of the individual defendants participated in the alleged tortious conduct.

## BACKGROUND

Anthony Gordon was admitted to Western State Hospital (WSH) at approximately 8:30 a.m. on January 3, 2008. [Declaration of Dr. Edward Kelly in Support of Defendants' Motion for Summary Judgment (hereafter *Kelly Dec.*), Dkt. # 31 at 3].  Mr. Gordon was admitted for a ninety-day competency restoration to stand trial for burglary, pursuant to a Grays Harbor County Superior Court Order.  [Order of Commitment, Declaration of Harold Karlsvik in Opposition to Defendant's Motion for Summary Judgment (hereafter *Karlsvik Dec.*), Dkt. #33, Ex. 1 at 5].

At approximately 10:00 a.m. on January 3, 2008, registered nurse Tal Kim performed Mr. Gordon's admission intake assessment.  [Kim Admission Intake Assessment, *Kelly Dec.*, Dkt. # 31, Exh. 2].  At WSH, newly admitted patients are initially screened to determine, among other things, the patient's risk for violence and self harm including suicide.  [*Kelly Dec.*, Dkt. # 31 at 3].  According to WSH suicide prevention protocol, a registered nurse assesses the potential for suicide or life-threatening self-harm by asking questions and investigating more subtle indications of suicide potential.  [WSH Procedure No. 305, *Karlsvik Dec.*, Dkt. # 33, Ex. 4 at 38].  There are three levels of suicide monitoring at WSH: constant, close, and unobtrusive.  *Id.* at 37.  A nurse may initially order constant monitoring for the acutely suicidal patient, under which a staff member must remain within patient reach and direct eye contact at all times.  If a physician determines the

patient is not an acute risk, the physician may reduce the level of monitoring to close monitoring. Under close monitoring, a staff member must maintain view of the patient by "line of sight" at all times. Finally, if a patient no longer needs constant or close monitoring, a physician can reduce the monitoring level to unobtrusive, under which a staff member will check the patient at irregular ten to fifteen minute intervals. Although a nurse may initially order monitoring, only a physician can reduce a monitoring level or discontinue it. *Id.*

Ms. Kim's notes indicate that Mr. Gordon had attempted suicide twice in recent months: once twenty-one days earlier, and the other four months earlier. [Kim Admission Intake Assessment, *Kelly Dec.*, Dkt. # 31 at 1, 3, & 4]. In both instances, Mr. Gordon took all his medications because he couldn't sleep. *Id.* In fact, Mr. Gordon told Ms. Kim that he regularly had trouble sleeping: without his medication, he would be up most of the night. *Id.* During the intake interview, however, Mr. Gordon denied feeling like, or planning to, hurt or kill himself. *Id.* Ms. Kim also indicated that Mr. Gordon hears voices occasionally, and appeared "depressed" even though he also appeared "alert, cooperative," and oriented to person, place, time, and situation. *Id.* at 4. Despite Mr. Gordon's candor in describing his recent suicide attempts, Ms. Kim did not write an order for suicide monitoring. *Id.*

In her role as Program Manager for the ward in which Mr. Gordon was assigned, Defendant Donna Slagle reviewed and approved Ms. Kim's admission intake assessment. [Declaration of Donna Slagle in Support of Defendants' Motion for Summary Judgment (hereafter *Slagle Dec.*), Dkt. # 29, at 2; Deposition of Donna Slagle (hereafter *Slagle Dep.*), *Karlsvik Dec.*, Dkt. #33, Ex. 3 at 23]. Although she was aware of Mr. Gordon's recent suicide attempts, and was authorized to write a nursing order to put Mr. Gordon on suicide watch, she did not write an order for constant monitoring. *Id.* at 26, 30.

Defendant Dr. Edward Kelly met with Mr. Gordon in the early afternoon of January 3, 2008. At WSH, a psychiatrist assesses each patient within the first day of his arrival, recording the initial assessment of the patient in an Admission Psychiatric Intake Record. [*Kelly Dec.*, Dkt. #31 at 2]. Before assessing Mr.

Gordon, Dr. Kelly briefly reviewed Mr. Gordon's chart and Ms. Kim's admission intake assessment, and consulted nursing personnel.  *Id.* at 3.    Because Mr. Gordon's chief complaint was "suicidal ideation/hallucinations," Dr. Kelly "paid special attention for indicators of any imminent suicide risk."  *Id.* Dr. Kelly's notes indicate that Mr. Gordon's most recent suicidal thoughts had been two days earlier, but that he did not currently have a suicide plan.   Mr. Gordon told Dr. Kelly that even if he was actively suicidal, he did not have the means that he had previously used to attempt suicide.  *Id*. at 4, 7.

        Even though Mr. Gordon was candid about his suicidal thoughts and history, Dr. Kelly concluded that "there was no indication of an imminent suicide risk in the assessment," and did not order suicide monitoring.  [*Kelly Dec.*, Dkt. #31 at 3].   In Dr. Kelly's expert opinion, Mr. Gordon's previous suicide attempts were the result of a combination of factors: illicit drug use, sleep deprivation, viewing bizarre websites, and failure to take psychiatric medications.  Because none of these factors were present while Mr. Gordon was in custody, and because Mr. Gordon was not actively depressed or psychotic, *id.* at 9, Dr. Kelly "didn't feel there was any need to have him restricted because of danger for himself or others." [Deposition of Edward Kelly (hereafter *Kelly Dep*.), *Karlsvik Dec.*, Dkt # 33, Ex. 11 at 18-19].  Dr. Kelly did, however, conclude that Mr. Gordon was a high suicide risk once released back in the community.  [*Kelly Dec.*, Dkt. #31 at 11].

        Mr. Gordon was not put on suicide monitoring.   The following afternoon, he committed suicide. Defendant Steven Anthony found Mr. Gordon at approximately 2:13 p.m., hanging from a bed sheet attached to his upturned bed.  [Deposition of Steven Anthony (hereafter *Anthony Dep.)*, *Karlsvik Dec.*, Dkt # 33, Ex. 12 at 36-38].  Pursuant to WSH policy, census checks are conducted every half hour, and WSH employees record the location of each patient on a census sheet.  *Id.* at 24.  Mr. Anthony was assigned to do the census checks starting at 1:00 p.m. on January 4, 2008.   However, because Mr. Anthony had to escort a patient to the central campus court, he asked Dan Salas to cover for him.  *Id.* at 30.  Dan Salas conducted the 1:30 p.m.

census check.[1]   [Deposition of Dan Salas (hereafter *Salas Dep.),* Dkt. #33, Ex. 14 at 48].   Although the

January 4, 2008 census sheet indicates that Mr. Gordon was out on the ward at 1:30 p.m., Dan Salas' 1:25

p.m. entry on Mr. Gordon's progress record indicates that Mr. Salas saw Mr. Gordon in his room.   [*Compare*

*Anthony Dep.*, Dkt. #33, Ex. 12 at 29 & 31 *with Salas Dep.,* Dkt. #33, Ex. 14 at 53-56, 58].   Mr. Salas recalls

seeing Mr. Gordon's face through the window to his room.   [*Salas Dep.,* Dkt. #33, Ex. 14 at 54].   In any

event, it is undisputed that Mr. Gordon was alive and accounted for at 1:30 p.m.

At 2:05 p.m., Mr. Anthony replaced Mr. Salas, beginning the 2:00 p.m. census.   [*Anthony Dep.*, Dkt.

#33, Ex. 12 at 33].   Upon discovering Mr. Anthony's body, Mr. Anthony immediately alerted other staff

members, and  Ms. Slagle attempted to perform CPR.  [*Slagle Dep.*, Dkt # 33, Ex. 3 at 31].   Despite WSH

staff's efforts, Anthony Gordon died.   The suicide was reported to the Lakewood Police Department and the

Pierce County Coroner, all of whom responded to the scene.   The coroner subsequently removed the body

from the scene in order to conduct an autopsy.

At approximately 5:00 p.m., Anthony Gordon's mother, Phyllis Gordon, called WSH.  [Deposition

of Phyllis D. Gordon (hereafter *Phyllis Gordon Dep.*, Dkt. #32 at 2].   A patient answered the phone.   When

she asked to speak with Anthony Gordon, the patient said "something bad has happened," and told her to call

the operator.   Ms. Gordon hung up and called the operator, and they transferred her to the nurse's station.

Ms. Slagle answered the phone.   [*Slagle Dec.*, Dkt. # 29 at 2].   Ms. Slagle did not discuss Mr. Gordon's

condition, but told Ms. Gordon that she would get someone to talk to her, which she did.   *[Id.*; *Phyllis Gordon*

*Dep.*, Dkt. #32 at 3].   Ms. Slagle handed the phone to Dr. William Richie, the Supervising Psychiatrist at

WSH.   [Declaration of Dr. William Richie in Support of Defendants' Motion for Summary Judgment

(hereafter *Richie Dec.*), Dkt. # 35-2 at 2].   Dr. Ritchie informed Mrs. Gordon that he was not authorized to

release information about Mr. Gordon under state law RCW 71.05, and the federal Health Insurance

---

[1] It is unclear from the record whether Mr. Anthony, Mr. Salas, or someone else conducted the 1:00 p.m. census.  Both Mr. Anthony and Mr. Salas deny doing the 1:00 p.m. census, and both assume that the other one did it.  [*Compare Anthony Dep.*, Dkt. #33, Ex. 12 at 35-36 *with Salas Dep.,* Dkt. #33, Ex. 14 at 48].

Portability and Accountability Act ("HIPAA"). *Id.* Ms. Gordon told Dr. Richie that Mr. Gordon would sign an authorization form. [*Phyllis Gordon Dep.*, Dkt. #32 at 2]. Dr. Richie said "okay," and agreed to call her back. *Id.* at 2, 3. The Gordons did not learn of their son's death until approximately 8 - 8:30 p.m. that night, when the police and a chaplain arrived at their home. [*Dec. of Phyllis Gordon*, Dkt. # 33 at 6].

Defendant Andrew Phillips was the Chief Executive Officer for WSH on January 3-4, 2008. [Declaration of Andrew Phillips in Support of Defendants' Motion for Summary Judgment (hereafter *Phillips Dec.*), Dkt. # 28, at 2]. Mr. Phillips had no knowledge that Mr. Gordon was receiving care at WSH until after he committed suicide. Mr. Phillips was not involved with the decision to not put Mr. Gordon on suicide watch. He was not involved with the coroner's decision to remove Mr. Gordon's body from WSH or to perform an autopsy, nor was he involved with the decision to preserve or destroy any ward videotapes. *Id.*

## ANALYSIS

**A.    Summary Judgment Standard**.

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

**B. The State, WSH, and DSHS are Immune from Liability under the Eleventh Amendment.**

Defendants ask the Court to dismiss Plaintiffs' state law claims against the State, DSHS, and WSH because they are immune from suit under the Eleventh Amendment. [Defendants' Motion for Summary Judgment, Dkt. #27 at 9]. Plaintiffs do not dispute this, arguing instead that the Defendants are being sued in their individual and official capacities, and that that creates a presumption that the Plaintiffs are seeking monetary damages from the Defendants in their personal capacities. [Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, (hereafter *Plaintiffs' Memo. in Opposition*), Dkt. #33 at p. 10]. The Eleventh Amendment does not, however, bar suit seeking damages against state officials in their individual capacities. *Hafer v. Melo*, 502 U.S. 21 (1991).

The Plaintiffs have not demonstrated[2] any waiver here, and none is apparent from the record. The State of Washington and its agencies–including DSHS and WSH–are immune from suit in this Court under the Eleventh Amendment. Accordingly, the Defendants' Motion to dismiss Plaintiffs' claims against the State of Washington, DSHS, and WSH under 42 U.S.C. § 1983, and under state law for wrongful death and survival, negligent and intentional infliction of emotional distress, spoliation, negligent training and supervision, and tortious interference with a body is therefore **GRANTED**, and these claims are dismissed WITHOUT PREJUDICE.

## C.  Viability of Plaintiffs' 42 U.S.C. § 1983 Claims.

To state a claim under 42 U.S.C. § 1983, a defendant must be a person acting under the color of state law, and his conduct must have deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

The Court will analyze Plaintiffs Phyllis and Marcos Gordon's  42 U.S.C. § 1983 claims for loss of companionship under the Fourteenth Amendment. The Ninth Circuit has recognized that the Fourteenth Amendment secures a parental liberty interest in the companionship of an adult child. *See Lee v. City of Los*

---

[2]Indeed, Plaintiffs have not substantively addressed the state Defendants' Eleventh Amendment immunity claims.

*Angeles,* 250 3d. 688 (9th Cir. 2001); *see also Rentz v. Spokane County*, 438 F.Supp.2d 1252, 1264 (E.D. Wash. 2006) ("Based on current Ninth Circuit authority, [plaintiff parents] are entitled to assert Fourteenth Amendment substantive due process causes of action seeking to vindicate their constitutional rights for loss of companionship with their adult son."). Thus, Plaintiffs' 42 U.S.C. § 1983 claim is viable insofar as it asserts that the conduct of these four WSH employees deprived Mr. Gordon of his Fourteenth Amendment liberty interest in safe conditions of confinement, adequate medical care, and life, and deprived Mr. Gordon's parents of a Fourteenth Amendment liberty interest in their relationship with their adult child.

Defendants seek summary judgment dismissing the 42 U.S.C. § 1983 claims of both the Estate of Anthony Gordon and those of his parents on three grounds. First, Defendants argue that the State, WSH, and DSHS are not Persons Subject to Suit under 42 U.S.C. § 1983. Second, Defendants argue that Ms. Slagle, Mr. Anthony, and Mr. Phillips did not participate in the alleged constitutional deprivation. Finally, Defendants argue that the facts do not support Plaintiffs' claim that Dr. Kelly's care fell below the accepted professional standard, or alternatively, that Dr. Kelly was deliberately indifferent to Mr. Gordon's serious medical need.

**1. The State, WSH, and DSHS are not Persons Subject to Suit under 42 U.S.C. § 1983.**

Defendants argue that in addition to being immune under the Eleventh Amendment, Plaintiffs' 42 U.S.C. § 1983 claims against the State, DSHS, and WSH should be dismissed because they are not persons subject to suit under that statute. Indeed, the State, its agencies and state officials sued in their official capacity are not persons subject to suit under § 1983. *See Will v. Michigan Dep't. Of Soc. Servcs.*, 491 U.S. 58 (1989). Thus, Defendants' motion to dismiss Plaintiffs' 42 U.S.C. § 1983 claims against the State, DSHS, and WSH is **GRANTED**.

**2. Defendants Andrew Phillips, Donna Slagle, and Steven Anthony Did Not Personally Participate in the Alleged Constitutional Deprivation.**

A defendant cannot be held liable in a civil rights action under 42 U.S.C. § 1983 if he or she did not

personally participate in the alleged deprivation. *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 781 (9th Cir. 1997). A defendant personally participates if he "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Although there is no pure respondeat superior liability under § 1983, a supervisor is liable for the constitutional violation of subordinates "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

### a. Andrew Phillips.

Although Andrew Phillips was the Chief Executive Officer for WSH at the time Mr. Gordon was committed, he was not involved in any of the acts plaintiffs assert. In fact, he did not even know that Mr. Gordon was receiving care at WSH until after Mr. Gordon's death. Thus, Mr. Phillips cannot be liable for the alleged constitutional violations of his subordinate health professionals because he did not participate in, direct, or know of and fail to prevent the alleged violations. Defendant's motion to dismiss Plaintiff's 42 U.S.C. § 1983 claim against Mr. Phillips is **GRANTED** for lack of participation.

### b. Donna Slagle.

Plaintiffs argue that Ms. Slagle participated in the alleged constitutional deprivation when she failed to order suicide monitoring, despite the fact that Anthony Gordon was a known suicide risk. Although she was aware of Mr. Gordon's history of attempted suicide, and was authorized to write a nursing order to put Mr. Gordon on suicide watch, Ms. Slagle did not write an order for suicide monitoring.

However, any decisions Ms. Slagle made about Mr. Gordon's monitoring status are irrelevant. According to WSH policy, nurses may initially order constant monitoring, but only doctors have the authority to reduce the monitoring level. In this case, Ms. Slagle reviewed Tal Kim's nursing assessment sometime in the morning of January 3, 2008, concluding that suicide monitoring was not necessary. Sometime that afternoon, Dr. Kelly met with Mr. Gordon, independently determining that Mr. Gordon was not a suicide risk.

Thus, the undisputed facts show that Ms. Slagle did not personally participate in the alleged constitutional deprivation because her failure to order suicide monitoring for Anthony Gordon did not cause the deprivation. Even if Ms. Slagle had ordered the monitoring, Dr. Kelly's independent conclusion that Mr. Gordon was not a suicide risk was an intervening cause. Thus, Defendant's motion to dismiss Plaintiff's 42 U.S.C. § 1983 claim against Donna Slagle is **GRANTED** for lack of participation.

**c. Steven Anthony.**

Plaintiffs argue that Mr. Anthony's care of Mr. Gordon fell below the accepted standard of care for health care providers, thus depriving Mr. Gordon of a constitutional right to adequate medical care. Plaintiffs point out that Mr. Anthony asked Mr. Salas to cover for him for the 1:00 p.m. and 1:30 p.m. censuses, but that Mr. Salas and Mr. Anthony both deny doing the 1:00 census. Plaintiffs use these facts to argue that Mr. Anthony's care fell below the professional standard. However, any dispute as to whether Mr. Anthony's training was adequate, or as to whether Mr. Anthony or Mr. Salas conducted the 1:00 p.m. census is irrelevant.

The facts show that Mr. Anthony's decision to have Mr. Salas cover for him (instead of conducting the census himself) had no bearing on Mr. Gordon's death. It is undisputed that Mr. Anthony was assigned to do 1:00 p.m. and 1:30 p.m. censuses, and he did not do them. It is also undisputed that Mr. Salas did the census at or about 1:30 p.m. Although the records differ as to Mr. Gordon's exact location during the 1:30 p.m. census, the facts show that Mr. Gordon was alive at that time. Finally, it is undisputed that Mr. Anthony resumed the census check at approximately 2:05 p.m., at which time he found Mr. Gordon hanging in his room.

Thus, Mr. Anthony cannot be liable for an alleged constitutional violation because his decision to have Mr. Salas replace him did not cause or contribute to Mr. Gordon's death. Defendant's motion to dismiss Plaintiff's 42 U.S.C. § 1983 claim against Mr. Anthony is **GRANTED** for lack of participation.

**3. A Reasonable Jury Could Find that Dr. Edward Kelly Participated in a Constitutional Deprivation**.

1    Plaintiffs' civil rights claim is premised on the assertion that Dr. Kelly's failure to order suicide

2  monitoring deprived Mr. Gordon of his right to life, and his parents of the right to companionship under the

3  Fourteenth Amendment. [Amended Complaint, Dkt. # 4, at 6].  The parties disagree as to the applicable

4  standard to determine whether there was a constitutional deprivation. Defendants direct the Court's attention

5  to the "deliberate indifference" standard articulated by the Supreme Court in *Farmer v. Brennan*, 511 U.S.

6  825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), and more recently, by the Ninth Circuit in *Conn v. City of Reno*,

7  591 F.3d 1081, 1094-95 (9th Cir. 2010), while the Plaintiffs argue that the Court should apply the "professional

8

9  judgment" standard set forth in *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982).

10    Defendants cite a line of cases holding that corrections officers are prohibited under the Fourteenth

11  Amendment from being deliberately indifferent to the serious medical needs of pretrial detainees.  *See*, *e.g.*,

12  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Clouthier v. County of Contra Costa*, 2010 WL 114958 (9th

13

14  Cir. 2010).  It is well established that jailers have a Constitutional duty to protect inmates from suicide. *See*,

15  *e.g.*, *Clouthier v. County of Contra Costa*, 2010 WL 114958 (9th Cir. 2010); *Snow ex rel. Snow v. City of*

16  *Citronelle*, 420 F.3d 1262, 1268 (11th Cir. 2005); *Cavalieri v. Shepard*, 321 F.3d 616, 623 (7th Cir. 2003);

17

18  *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003); *Strandberg v. City of Helena*, 791 F.2d 744, 749 (9th

19  Cir. 1986); *Rentz v. Spokane County*, 438 F.Supp.2d 1252, 1265 (E.D.Wash. 2006).  Under this standard,

20  Defendants argue that Dr. Kelly was not "deliberately indifferent" to the known risk that Mr. Gordon would

21  commit suicide.

22    Plaintiffs, on the other hand, cite to a line of cases holding that individuals who are civilly committed

23  due to their mental capacity are entitled to a higher standard of medical care than that of a pretrial detainee.

24

25  *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982).  Under the "professional judgment" standard, a healthcare

26  professional may be liable only when the professional's decision is "such a substantial departure from

27  accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually

28  did not base the decision on such a judgment."  *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982).  Plaintiffs

argue that Dr. Kelly took part in the constitutional deprivation because his decision departed from the accepted professional judgment, practice, or standard. [Plaintiff's Memo. in Opposition, Dkt. # 33 at 14].

Because Mr. Gordon was committed to WSH for purposes of a competency restoration so that he could stand trial under RCW 10.77.086, the parties disagree as to whether Mr. Gordon should be considered a civilly committed mental patient (in which case the professional judgment standard applies), or a pretrial detainee (in which case the deliberate indifference standard applies).

But the Court need not choose between the dueling standards at this time. Defendants cannot prevail on summary judgment under either standard because genuine issues of material fact exist as to whether Dr. Kelly was deliberately indifferent to Mr. Gordon's serious medical needs, or alternatively, whether his care fell below the accepted professional standard.

To state a constitutional claim under the Eighth Amendment for an official's failure to provide medical treatment, a plaintiff must show (1) a serious medical need, and (2) the official was deliberately indifferent to that need. *Conn*, 591 F.3d at 1095 (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). The second prong has both objective and subjective components: it requires a purposeful act or failure to respond to a prisoner's medical need and harm caused by that indifference. *Id.*

Plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to whether Mr. Gordon's suicidal tendencies were a serious medical need. A prisoner has a serious medical need if failure to treat that inmate's condition could result in further significant injury or would result in the unnecessary and wanton infliction of pain contrary to contemporary standards of decency. *Doty v. County of Lassen*, 37 F.3d 540, 54 (9 th Cir. 1994). Courts have found that a heightened suicide risk is a serious medical need. *See Conn*, 591 F.3d at 1095-96. In this case, Mr. Gordon had recently attempted suicide twice. And even though he claimed that he did not currently have a suicide plan, he admitted that his most recent suicide thoughts had been two days earlier. Plaintiffs have presented sufficient evidence of Mr. Gordon's objective, serious medical need for a reasonable jury to find in their favor.

As for the second prong, Plaintiffs argue that Dr. Edward Kelly was deliberately indifferent to Mr. Gordon's suicide risk.   "[I]f a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction." *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002). "When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir.2005). "[D]eliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).

Dr. Kelly was responsible for making the decision of whether or not to put Mr. Gordon on suicide monitoring. After assessing Mr. Gordon, Dr. Edward Kelly concluded that Mr. Gordon did not need to be restricted because he was not a danger to himself or others.   There is substantial evidence that Mr. Gordon was a suicide risk, and the undeniable inference from this evidence is that defendant Kelly should have been aware of that fact.  Thus, there are genuine issues of material fact as to whether he was deliberately indifferent to a substantial risk of serious harm to Mr. Gordon.  Plaintiffs have met their burden under the professional judgment standard as well: there is a genuine issue of material fact as to whether Dr. Kelly's decision not to put Mr. Gordon on suicide monitoring was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."   Accordingly, Defendant's motion to dismiss Plaintiff's 42 U.S.C. § 1983 claim against Dr. Kelly is **DENIED**.

**D.  Outrage and Negligent Infliction of Emotional Distress.**

Defendants argue that Plaintiffs' claims for negligent and intentional infliction of emotional distress should be dismissed because they cannot establish the elements of either claim. [Dkt. # 27].

**1.  No Reasonable Jury Could Find that Donna Slagle's Conduct Constituted Outrage**

In order to prevail on a claim of intentional infliction of emotional distress, or outrage, a plaintiff must

prove that defendants engaged in (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) that plaintiff suffered severe emotional distress. *Kloepfel v. Bokor*, 149 Wn.2d 192, 195-96 (2003).  Although the question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, the court must initially determine whether "reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989).

"The conduct in question must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Snyder v. Medical Serv. Corp. of E. Wash.*, 145 Wn.2d. 233, 242, 35 P.3d 1158 (2001) (quoting *Birklid v. Boeing Co.*, 127 Wn.2d 853, 867, 904 P.2d 278 (1995)) (quoting *Dicomes*, 113 Wn.2d at 630).

Plaintiffs assert that Donna Slagle and Dr. William Richie lead Phyllis Gordon to believe that her son was still alive, and that this behavior was so outrageous as to shock the conscience.  Ms. Gordon called WSH at 5:02 p.m., two hours after her son had died.  A patient told her that  "something bad has happened."  Ms. Gordon hung up and called the operator, and they transferred her to Ms. Slagle.  Ms. Slagle did not discuss Mr. Gordon's condition; rather, she told Ms. Gordon that she would get someone to talk to her, which she did. Dr. Ritchie informed Ms. Gordon that he was not authorized to release information about Mr. Gordon.  Ms. Gordon told Dr. Richie that Mr. Gordon would sign an authorization form.  Dr. Richie said "okay," and agreed to call her back.  The Gordons did not learn of their son's death until approximately 8 - 8:30 p.m. that night, when the police and a chaplain arrived at their home.

Plaintiffs argue that because neither Ms. Slagle nor Dr. Richie informed her of Anthony Gordon's death, their behavior was outrageous.  Plaintiffs also assert that they were required to inform the Plaintiffs on the phone according to WSH policy.  However, according to WSH Procedure 228, a physician notifies the family of the suicidal death of a WSH patient.  Dr. Richie is not a party to this action.  And because Ms. Slagle is not a doctor, she was not required under WSH Procedure 228 nor authorized under HIPAA to notify the family.  Reasonable minds could not differ as to whether Ms. Slagle's failure to tell Ms. Gordon on the phone

that her son had died was sufficiently outrageous: no reasonable jury could find that Ms. Slagle's behavior was so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Defendants' motion for summary judgment on this claim is **GRANTED.**

### 2. Negligent Infliction of Emotional Distress.

Plaintiffs assert that Donna Slagle's conduct after Mr. Gordon's suicide creates a claim for the negligent infliction of emotional distress. "Where a plaintiff brings suit based on negligent infliction of emotional distress 'we test the plaintiff's negligence claim against the established concepts of duty, breach, proximate cause, and damage or injury.'" *Snyder*, 145 Wn.2d at 243 (quoting *Hunsley v. Giard,* 87 Wn.2d 424, 433, 553 P.2d 1096 (1976)). For negligent infliction of emotional distress, a plaintiff must prove that she has suffered emotional distress manifested by objective symptoms that are "susceptible to medical diagnosis and proved through medical evidence." *Kloepfel*, 149 Wn.2d at 196-97.

Here Plaintiff, Phyllis Gordon, called WSH at 5:02 p.m., approximately two hours after her son had died. Although she spoke to both Dr. Richie and Ms. Slagle, neither one informed her that her son had died. Plaintiffs assert that Ms. Slagle had a duty to notify her of her son's death because the Western State Policy and Procedure 228 requires a physician on duty to notify the family of the patient's death. Phyllis and Marcos Gordon did not find out that Anthony Gordon had died until 8:00 or 8:30 p.m. that night, approximately five hours after Anthony's death. For five hours, Phyllis and Marcos Gordon were led to believe that their son was alive, and were worried to hear what was going on with their son. Plaintiffs claim that this situation resulted in emotional distress and mental suffering, for which they continue to receive counseling.

Because Ms. Slagle is not a doctor, she was not required under WSH Procedure 228 nor authorized under HIPAA to notify Ms. Gordon of her son's death. Furthermore, Ms. Slagle did not tell Ms. Gordon whether her son was alive or dead; rather, she simply handed the phone to Dr. Richie. Thus, the undisputed facts show that Donna Slagle did not breach a duty of care owed to Plaintiffs Phyllis and Marcos Gordon.

1   Defendant's motion to dismiss Plaintiffs' negligent infliction of emotional distress claim is therefore

2   **GRANTED.**

3       **E. Tortious Interference with a Body.**

4       Defendants argue that Plaintiffs cannot establish a claim for tortious interference with a dead body

5   because there is no Washington authority creating such an action.  Defendants further argue that the county

6   coroner, not the hospital, had statutory jurisdiction over the body because the decedent's death was a result of

7   unnatural causes under RCW 68.50.010.  Plaintiffs argue that Anthony Gordon's body was taken and submitted

8   to an autopsy without their approval, and they were denied access to the body for five days. They fail to

9   explain, however, how any of the individual defendants were involved with or responsible for these activities.

10  It is undisputed that none of the individual Defendants were involved in the decision to release the body to the

11  coroner or the coroner's decision to conduct an autopsy.  Because the State, WSH, and DSHS are immune from

12  liability under the Eleventh Amendment, and because Plaintiffs have failed to explain how any of the

13  individual defendants are liable for interfering with Anthony Gordon's body, Defendants' motion for summary

14  judgment on this claim is therefore **GRANTED**.

15      **F. Spoliation.**

16      Defendants argue that Plaintiffs' spoliation claim should be dismissed because Washington does not

17  recognize a separate cause of action for spoliation.  Plaintiff concedes that point, [Dkt.# 33 at 23], but asserts

18  that the proper remedy for spoliation is a sanction.  *Id.*  Although spoliation has traditionally been treated as

19  an evidentiary matter, courts have recognized that spoliation may be treated as a civil discovery violation, the

20  sanction for which can be found in Fed. R. Civ. P. 37, or by the courts' inherent power to control litigation.

21  *Henderson v. Tyrell*, 80 Wn.App. 592, 605, 910 P.2d 522 (1996).  Courts determine the proper sanction for

22  destruction or suppression of relevant evidence on a case-by-case basis.  *Unigard Security Ins. Co. v.*

23  *Lakewood Eng. & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992).

24      Plaintiffs correctly argue that summary judgment is inappropriate at this time because the State has

never explained what happened to the videotape,[3] and the video technician has not yet been deposed. [Dkt. # 33 at 24]. Because Washington does not recognize a cause of action for spoliation, Defendants' motion for summary judgment on this claim is therefore **GRANTED**. The Court will determine whether sanctions are appropriate once the video technician has been deposed and the Court has heard the evidence.

**H. Negligent Training or Supervision.**

Plaintiffs' negligent training and supervision claim is asserted against Western State Hospital only. Because  WSH is immune from liability under the Eleventh Amendment, and because Plaintiffs have failed to explain how their claim for negligent training and supervision can be asserted against the individual defendants, Defendants' motion to dismiss Plaintiffs' negligent training and supervision claim is **GRANTED**.

**CONCLUSION**.

Defendants' Motion for  Summary Judgement on Plaintiff's §1983 claims against Dr. Kelly is DENIED. Plaintiff's state law claims against the State Defendants are barred by the Eleventh Amendment and those claims are DISMISSED WITHOUT PREJUDICE.  Defendants Motion for Summary Judgment  on all other

//

/

claims against all other Defendants is GRANTED, and those claims are DISMISSED with Prejudice.

IT IS SO ORDERED.

Dated this 29th day of March, 2010.

---

[3]In its Motion for Summary Judgment [Dkt. # 27], Defendants assert that the tape was "overwritten in the ordinary course of business, and defendants deny that this was done for any improper purpose or to destroy evidence related to this case." [Dkt. # 27 at 20]. These are not proper grounds upon which summary judgment may be granted.

(signed per telephone authorization)
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE